UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ADVANCED MAGNETIC CLOSURE, INC.,  <u>MEMORANDUM DECISION
                                  AND ORDER</u>
               Plaintiff,     98 CV 7766 (GBD)

      -against-

ROME FASTENER CORPORATION, ROME
FASTENER SALES CORPORATION, ROMAG
FASTENERS, INC. AND RINGS WIRE, INC.,

               Defendants.
------------------------------------------------------------------x
GEORGE B. DANIELS, District Judge:

      Plaintiff owns United States Patent No. 5,512,773 ("the '773 patent") which is a magnetic snap fastener used primarily as a closure device for purses. Plaintiff commenced this action seeking injunctive relief and monetary damages claiming the magnetic fastener made and sold by defendants, literally infringes claims 1, 8, and 9 of the '773 patent. The complaint also sets forth claims for false marking, false advertising under the Lanham Act, and for common law unfair competition. These causes of action are based on defendants marking their fastener to read U.S. Patent No. 5,572,126 ("the '126 patent"), and advertising that their fastener is covered by the claims of the '126 patent. Plaintiff maintains that defendants' fastener is not covered by the '126 patent, and is infringing on its '773 patent.

      A <u>Markman</u> hearing was held to determine the disputed claims in the '773 patent. Specifically, the parties are disputing a phrase in claim 1 concerning increased magnetism and the meaning of the word "covered" as used in claim 9. The Court reserved decision on plaintiff's application that the claims of the '126 patent should be interpreted as well. Plaintiff is also moving to amend the complaint. Defendants object, claiming it is a tactical maneuver aimed at

reopening discovery.

## CLAIM CONSTRUCTION

The purpose of a Markman hearing is for the court to determine, as a matter of law, the interpretation and construction of the contested claims of a patent. Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed.Cir. 1995), *aff'd*, 517 U.S. 370 (1996). Where possible, claims should be construed to sustain their validity, but not if to do so would constitute a redrafting of the claims by the court. Quantum Corp. v. Rodime, PLC, 65 F.3d 1577, 1584 (Fed.Cir. 1995) (citations omitted). In interpreting a claim, a court should first examine the intrinsic evidence consisting of the patent itself, the specification, and, if in evidence, the prosecution history. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed.Cir. 1996). Not all intrinsic evidence is, however, of equal probative value. Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001) (citation omitted). Thus, the court's review "must begin and remain centered on the language of the claims themselves." Id. (citation omitted). "The terms used in the claims bear a 'heavy presumption' that they mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art." Texas Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202 (Fed.Cir. 2002) (citations omitted). Dictionaries may be utilized in determining the ordinary meanings of claim terms provided the dictionary definition does not contradict any definition specified in or ascertained by the reading of the patent papers. Id.; Interactive Gift Express, Inc., 256 F.3d at 1332 n.1; Vitronics Corp., 90 F.3d at 1584 n.6.

Only after an analysis of the language of the claim itself, should the court consider the

rest of the intrinsic evidence beginning with the specification and ending with the prosecution history, if in evidence. Interactive Gift Express, Inc., 256 F.3d at 1331. If the claim language is not clear on its face, consideration of the remaining intrinsic evidence is directed to resolving, where possible, the lack of clarity. Id. Where claim language is unambiguous, however, then consideration of the remaining intrinsic evidence is restricted to determining whether a deviation from the clear language of the claim is specified. Id.

"The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it." Vitronics Corp., 90 F.3d at 1582. An examination of the specification ensures that the applicant is using the claim terms in a manner consistent with their ordinary meanings. A deviation may exist where the patentee has acted as his or her own lexicographer and uses the specification, implicitly or explicitly, to attribute a different meaning to a term. Invitrogen Corp. v. Biocrest Mfg., L.P., 327 F.3d 1364, 1367 (Fed.Cir. 2003); Interactive Gift Express, Inc., 256 F.3d at 1331; Vitronics Corp., 90 F.3d at 1582.

Lastly, the court is to consider, if in evidence, the prosecution history. "This history contains the complete record of all the proceedings before the Patent and Trademark Office ("PTO"), including any express representations made by the applicant regarding the scope of the claims." Vitronics Corp., 90 F.3d at 1582. Statements made to the patent examiner during the prosecution of the patent may shed light on the scope of the claims. Invitrogen Corp., 327 F.3d at 1367. The applicant may "relinquish [a] potential claim construction in an amendment to the claim or in an argument to overcome or distinguish a reference." Interactive Gift Express, Inc., 256 F.3d at 1331 (quoting Elkay Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973, 979 (Fed.Cir. 1999)).

Where the intrinsic evidence is insufficient to enable the court to construe the disputed claims, the court may then consider extrinsic evidence. Interactive Gift Express, Inc., 256 F.3d at 1332. "Extrinsic evidence is that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles." Vitronics Corp., 90 F.3d at 1584. Even though dictionaries technically fall within the category of extrinsic evidence, "[j]udges are free to consult such resources at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." Id. at 1584 n.6. In the instant case, the intrinsic evidence, in conjunction with the aid of dictionary definitions, provides a sufficient basis for the Court to determine the meaning of the disputed claims, and hence the Court need not resort to consideration of other extrinsic evidence.

## THE '773 PATENT

CLAIM 1:

Plaintiff's fastener is comprised of two halves, a female half and a male half. A donut shaped magnet, referred to as the magnetic member, is mounted on the female half. A rivet is positioned at the periphery of the hole in the magnet, leaving the hole in the magnet at least partially unobstructed. The male half is made of magnetically attractive material. It contains a rivet protruding outward that fits within the hole of the magnet to fasten the two halves together. At least one of the two rivets contain a small hole. The purpose of the hole is the central focus of the parties' dispute as to claim one, the only independent claim at issue.

The last element of claim one provides:

> said magnetic member creates a magnetic circuit which passes at least through a periphery of said first rivet of said female member, which said small hole in said one of said first and second rivets <u>increasing the magnetic attraction of said magnetic member by modifying a resistance to said magnetic circuit at said first and second rivets</u>. (emphasis added).

Plaintiff maintains that the underlined portion of claim one should be interpreted to mean that the purpose of the rivet hole, in the context of the closure, is to provide an increase in magnetic attraction. Defendants contend that this language must be construed to mean that the small hole in at least one of the rivets, and no other element, causes the increase in magnetic attraction of the magnet itself, *i.e.*, that the power of the magnet is intensified.

The claim language does not speak in terms of increasing the power of the magnet. Rather, it states that the magnetic attraction is increased. The dictionary defines "attraction" as "the act or capability of attracting" and defines "attract" as "to cause to draw near or adhere; direct to or toward itself or oneself . . ." The American Heritage Dictionary of the English Language at 120 (Houghton Mifflin Co. 3d ed. 1996). Although it is possible to increase magnetic attraction, it is impossible to increase a magnet's power to attract. The inherent strength of a magnet is fixed. The magnetic attraction, as opposed to the magnet's power, can be enhanced as a result of the physical surroundings in which the magnet is placed. For example, it is common knowledge that the further away a magnet is placed from a metal object, the less attraction they will have to each other. That is, the ability of the magnet to draw the metal object toward it is decreased as a result of the distance. If a piece of wood, or other non-magnetic barrier, is placed between the magnet and the metal, the magnetic attraction is similarly decreased.

5

Defendants are correct in noting that the claim language does indicate that the magnetic attraction of the magnet is amplified. It does not state that the magnetic attraction between the magnet and the male half is increased. The flaw with defendants' argument, however, is that they focus on the word increase as it relates to the phrase magnetic member, instead of the claim limitation as a whole, in context. See e.g., Quantum Corp., 65 F.3d at 1581 (citing United States v. Teletronics, Inc., 857 F.2d 778, 781 (Fed.Cir. 1988)). The claim language continues with the explanation as to how the magnetic attraction is able to be enhanced. It states, "by modifying a resistance to said circuit at said first and second rivets." The specific language of the claim does not purport that the rivet hole alone acts to strengthen the magnetic attraction by increasing the inherent strength of the magnet. Rather, the small hole affects the circuitry when the male and female halves are brought together. Defendants' contention that the small hole, and no other element or feature of the fastener, causes the increase in the magnetic attraction is untenable. Absent the surrounding environment in which the rivet hole is situated, no magnetic circuit could be obtained. It is the location of the rivet hole, within the overall physical structure formed when the two halves are brought together, that creates a change within the magnetic circuitry, not a change to the magnet itself. Such a modification enables the inherent power of the magnet to be harnessed in such a manner as to allow the magnet to operate more efficiently, thereby increasing the attraction of the male half toward the magnet.

Nothing within the specification or prosecution history indicates that the claim should be interpreted to mean that the small hole in at least one of the rivets causes the magnet's inherent power to grow stronger. The specification states:

> The utilization of the small hole through the center of the rivet modifies an interference or resistance to magnetic lines of flux (magnetic circuit) which pass

through at least a periphery of the rivet and are caused by a permanent magnet of the female member. By modifying the resistance to the magnetic circuit, the magnetic attraction of the magnetic member is increased.

Similarly, in the abstract portion of the patent, it states: "at least one of the rivets can include a small hole which serves to modify a resistance to a magnetic circuit created by the magnetic member and thereby increase a magnetic attraction of the magnetic member."

Defendants argue that these passages support their contention that the claim must be read as to require that the magnetic attraction of the magnet itself is increased. The claim, as well as these portions of the patent relied on by defendants, would have been clearer had it been drafted to state that the magnetic attraction between the magnet (located on the female half) and the male half is increased. Other passages in the specification do indicate that the magnetic attraction refers to the two halves of the fastener, not to the magnet itself. The specification also states, "[t]he small holes extending substantially through at least one of the rivets modifies resistance to the magnetic circuit and thereby enhances the magnetic attractions between the male and female members . . ." The specification additionally provides:

> The magnetic circuit flows through at least a periphery of the rivets . . . By utilizing small through holes . . . substantially through at least one of the rivets . . ., an interference to the magnetic circuit at the center of the rivet . . . can be modified. The modification in interference at the center will cause a modification in the resistence to the magnetic circuit and thereby increase the magnetic attraction. Accordingly, the provision of having a small hole drilled at least substantially through at least one of the rivets . . . will modify a resistance to the magnetic circuit and thereby increase the magnetic attraction and holding power of the magnetic snap lock.

These excerpts indicate that the increase in the magnetic attraction is between the two halves of the fasteners when in a closed position. The male half contains no magnet and therefore has no ability to attract. The magnet is the instrumentality by which the ability to

7

attract is derived. Therefore, the specification merely indicates that the magnetic attraction, emanating from the magnet itself, is increased. That increase occurs within the context of the magnetic circuit created as the male and female halves come together at the rivets when the fastener is in the closed position.

The prosecution history does reveal that the purpose of the rivet hole was a central issue in obtaining the patent. When the patent was initially submitted to the PTO for consideration, claim 1 did not contain the disputed language. The examiner rejected Claim 1 as unpatentable given the existence of a prior similar patent, *i.e.*, U.S. patent No. 5,042,116 ("the '116 patent"). The '116 patent fastener has a male projection pin with a recess that houses the female pin when the device is closed. The PTO found that the hole in the pin, in the '116 patent, is equivalent to the small hole in one of the rivets in the '773 patent fastener. Therefore, since the applicant had "not claimed or defined that the 'small hole' in one of the rivets solves any stated problem or is, for any particular purpose," claim 1 was rejected.

Defendants argue that the patentee added the language that the rivet hole increases the magnetic attraction in an effort to overcome the examiner's rejection and to distinguish this fastener from the '116 patent. The prosecution history demonstrates that the disputed language was not an afterthought added by the patentee as a direct result of the examiner's comments in initially rejecting claim 1. In the original draft of the patent application, claim 7 dealt with the increase of magnetic attraction by a change within the magnetic circuit at the site of the rivets. It read as follows:

> A magnetic snap lock according to Claim 1, wherein said magnetic member creates a magnetic circuit which passes at least through a periphery of said first rivet of said female member, said first and second rivets increasing a magnetic attraction of said magnetic member by reducing a resistance to said magnetic

8

circuit at said first and second rivets.

Although proposed claim 7 did not specifically address the existence of the rivet hole and its purpose, the original specification did. It stated:

> The magnetic circuit flows through at least a periphery of the rivets . . . by utilizing small through-holes . . . substantially through at least one of the rivets . . ., an interference to the magnetic circuit at the center of the rivet . . . can be reduced. The reduction in interference at the center will cause a reduction in the resistance to the magnetic circuit and thereby increase the magnetic attraction. Accordingly, the provision of having a small hole drilled at least substantially through at least one of the rivets . . . will reduce a resistance to the magnetic circuit and thereby increase the magnetic attraction and holding power of the magnetic snap lock.

In seeking reconsideration by the PTO, the applicant's amending papers noted:

> Claim 1 has been amended to include further minor clarifying amendments with respect to features of the small hole set forth in Claim 7. During the interview, the Examiner indicated that these clarifying amendments were acceptable and would place Claim 1 in condition for allowance. As noted in the Official Action, and agreed upon by the Examiner at the personal interview, the applied references are not believed to show or suggest the specific combination of elements set forth in amended Claim 1 including the features of the small holes which modifies a resistance to the magnetic circuit at the first and second rivets. In the present invention, the presence of the small hole in the center of the rivet modifies the flux density of the magnetism through the rivet to a desired value consistent with the material of which the rivet is constructed and the desired properties of the device.

Based on this amendment, as well as others, the invention was granted a patent. Notwithstanding defendants' contention to the contrary, the prosecution history fails to reveal that the amendment to claim 1 was intended to limit the claim only to magnetic fasteners that have at least one rivet hole which solely operate, separate and apart from anything else, to increase the magnetic attraction by increasing the power of the magnet.

Accordingly, the Court finds that the last element of claim 1 is interpreted to mean as

9

follows:

> and in which the magnet causes lines of magnetic flux to pass through at least the outer sides of the rivet in the female half, and the small hole(s) in one or both rivets modifies their resistance to the flux and thereby increases the magnetic attraction.

CLAIM 9:

The parties are also disputing the meaning of the word "covered" as used in Claim 9 which states, in pertinent part, "said magnetic member is covered with a non-ferromagnetic material." Defendants argue that "covered" means a thin film layer. Plaintiff contends that the term "covered" should be interpreted as being structural in nature. Plaintiff notes that claim 10, which defendants are not accused of infringing, provides that the "magnetic member is coated with a non-ferromagnetic material." Plaintiff asserts that accepting defendants' interpretation of claim 9 would result in the words "covered" and "coated" as having the same meaning. Plaintiff contends that by allowing both claims to survive, the examiner obviously recognized that claims 9 and 10 are claiming two different things. Additionally plaintiff argues that the doctrine of claim differentiation precludes claims 9 and 10 from being interpreted to mean the same thing as it would render one of the claims superfluous. Thus, plaintiff maintains that since claim 10 refers to a layer of non-ferromagnetic material coating the magnet, claim 9 must invariably refer to a physical structure comprised of non-ferromagnetic material which covers the magnet.

The word "cover" can be used as either a noun or verb. Used as a noun it would refer to a device such as a lid or cap that is placed over or upon something else. Claim 9 uses the compound verb "is covered." The verb "cover" has the following primary meanings: "to place something upon or over, so as to protect or conceal;" "[t]o overlay or spread with something;"

10

and "[t]o spread upon the surface of." The American Heritage Dictionary of the English Language, *supra*, at 432. Claim 10 uses the compound verb "is coated." The verb "coated" means "to cover with a layer." Id. at 363. When an object is coated with a material, the material forms a continuous film over the surface of the object. See e.g., Astra Aktiebolag v. Andrx Pharmaceuticals, Inc., 222 F.Supp.2d 423, 464 (S.D.N.Y. 2002) (quoting McGraw-Hill Dictionary of Scientific and Technical Terms, 5th ed. at 394 (1994)), *aff'd sub nom.* In re Omeprazole Patent Litigation, 2003 WL 22928641 (Fed.Cir. 2003). Thus, in the context of claims 9 and 10, the terms "covered" and "coated" are used in such a manner as to render them with an identical meaning. See eg., Leighton Technologies LLC v. Oberthur Cord Sys., S.A., 358 F.Supp.2d 361, 379 (S.D.N.Y. 2005); Yanova, Inc. v. Johnson, 2005 WL 66610, *4 (S.D.N.Y. Jan. 12, 2005); Revlon Consumer Prods. Corp. v. Estee Lauder Companies, Inc., 2003 WL 21751833, *16 (S.D.N.Y. July 30, 2003) (citations omitted).

Such a finding runs afoul to the doctrine of claim differentiation. Under this doctrine, it is presumed to be a difference in meaning and scope when different words are used in different claims. Kraft Foods, Inc. v. Int'l Trading Co., 203 F.3d 1362, 1366 (Fed.Cir. 2000); Tandon Corp. v. U.S. Int'l Trade Comm'n, 831 F.2d 1017, 1023 (Fed.Cir. 1987). "To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant." Tandon, 831 F.2d at 1023. Thus, the Court should avoid interpreting a claim in such a manner if it would make the claims read like another claim. However, claim differentiation "is not a hard and fast rule of construction," but rather it only creates a rebuttable presumption that each claim has a different scope from one another. Comark Communications, Inc. v. Harris Corp., 156 F.3d

11

1182, 1187 (Fed.Cir. 1998); see also, ADT Corp. v. Lydall, Inc., 159 F.3d 534, 541 (Fed. Cir. 1998)(quoting Autogiro Co. of Am. v. United States, 384 F.2d 391, 404 (Ct.Cl. 1967) ("The presumption that separate claims have different scope 'is a guide, not a rigid rule.'"). Despite the fact that interpretations that would render a portion of the language of a claim superfluous are disfavored, "where neither the plain meaning nor the patent itself commands a difference in scope between two terms, they may be construed identically." Power Mosfet Technologies, L.L.C. v. Siemens AG, 378 F.3d 1396, 1410 (Fed.Cir. 2004). If the claim can only bear one interpretation, similarity must be tolerated. Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1538 (Fed.Cir. 1991) (quoting Autogiro Co., 384 F.2d at 404). "Although the doctrine of claim differentiation may at times be controlling, construction of claims is not based solely upon the language of other claims; the doctrine cannot alter a definition that is otherwise clear from the claim language, description and prosecution history." O.I. Corp. v. Tekmar Co., Inc., 115 F.3d 1576, 1582 (Fed.Cir. 1997) (citation omitted). The doctrine does not permit a claim to be broadened beyond its correct scope as determined by the specification and claims as filed, as well as the prosecution history and any relevant extrinsic evidence. Toro Co. v. White Consol. Industries, Inc., 199 F.3d 1295, 1302 (Fed.Cir. 1999); Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1480 (Fed.Cir. 1998); ADT Corp., 159 F.3d at 541; Tandon, 831 F.2d at 1024. "The words of patent claims have the meaning and scope with which they are used in the specification and prosecution history." Kinik Co. v. Int'l Trade Comm'n, 362 F.3d 1359, 1365 (Fed.Cir. 2004); see also, Toro Co., 199 F.3d at 1301 (a word in a claim should not be construed in a "lexicographic vacuum," but rather it is interpreted in the context of the specification and drawings.).

In the case at bar, the specification and prosecution history overcome any presumption arising from the doctrine of claim differentiation. The prosecution history reveals that when claim 9 was originally submitted to the PTO, it read that the magnet was "covered and/or coated with non-ferromagnetic material." Claim 9 was initially rejected because the examiner found that the use of the phrase "and/or" was too vague. Additionally, the original specification contained two references to the placement of the non-ferromagnetic material on the magnet. First, it stated that the magnet "can be covered with a non-ferromagnetic material." Further in the text it stated that the magnet "can be coated with a non-ferromagnetic material." With regard to the latter statement, the examiner deleted the words "be coated" and replaced it with the word "covered." As a result, the official specification is silent with regard to the magnet being "coated" with the non-ferromagnetic material. The specification contains the following two references to the magnet being covered with the material:

> [T]he magnetic member can be covered with a non-ferromagnetic material as illustrated in FIG. 1. In the embodiments of FIGS. 1 and 2 which include end walls, a space can be defined between the end wall and the magnetic member. The space can be either opened or filled with the non-ferromagnetic material as illustrated in each of FIGS. 1 and 2. The non-ferromagnetic material stabilizes the magnetic member.
>
> * * *
>
> [S]imilar to the embodiments of FIGS 1-4, the magnetic member can be covered with a non-ferromagnetic material and a space can be defined between the magnetic member and the end walls . . . The space can be filled with the above-noted non-ferromagnetic material or can be open.

Thus, the prosecution history reveals that the applicant was using the terms "coated" and "covered" interchangeably. Additionally, despite claim 10 stating that the magnet is coated with non-ferromagnetic material, the specification makes no mention with regard to the magnet being

coated with such material. Rather, the specification indicates that the magnet is covered with the material. Moreover, the specification does not provide that a tangible structure is placed over the magnet. Similarly, none of the schematic drawings depict a physical structure over the magnet. "The drawing in a nonprovisional application of the invention must show every feature of the invention specified in the claims." 37 C.F.R. 1.83(a).

Plaintiff contends that since the specification provides that the magnet is covered with non-ferromagnetic material to stabilize the magnet, a solid physical cover, as oppose to a film covering, would be necessary. There is no basis to conclude that the act of stabilizing the magnet cannot be accomplished by covering the magnet with a layer of non-ferromagnetic material in a liquid or gelatinous form which can form a protective membrane over the magnet. Additionally, the specification provides that the space between the magnet and end wall can also be filled with the non-ferromagnetic material. Such a statement further indicates that the non-ferromagnetic material is in a liquid-type state capable of being used to fill an existing open space.

To construe claim 9 as requiring a physical entity made of non-ferromagnetic material which is physically placed over the magnet would improperly broaden claim 9 beyond the specification, the drawings depicting the invention, and the prosecution history. Thus, claim 9 is construed to mean "a magnetic snap as described by claim 1 in which the magnet is covered with a film layer of non-ferromagnetic material."

## THE '126 PATENT

Plaintiff argues that the claims of defendants' '126 patent should be interpreted by the Court for two reasons. First, plaintiff argues that defendants' present position regarding the

purpose of the rivet hole is contrary to the position taken during the prosecution of the '126 patent. Therefore, plaintiff maintains that the Court should construe the claims of both parties' patents consistently with one another. Additionally, plaintiff argues that claim construction is warranted because plaintiff has asserted causes of action for false advertising and false marking. Plaintiff contends that those causes of action are based, in part, on the claims of the '126 patent, as properly interpreted in light of the specification, to require the fastener to have rotable legs, which defendants' product does not have.

This Court's determination as to the proper claim construction of the '773 patent rests solely on the intrinsic evidence related to that patent. Any representations made in regard to the prosecution of the '126 patent is irrelevant to the interpretation of the scope of the '773 patent claims. An infringement determination involves two steps. The first step is for the court to determine the proper meaning and scope of the patent claims asserted to be infringed. Omega Eng'g, Inc. v. Rayteck Corp., 334 F.3d 1314, 1320 (Fed.Cir. 2003) (citation omitted); Markman, 52 F.3d at 976. In the second step, the alleged accusing device is compared to the properly construed claims. Id. The first step, claim construction, is a matter of law, and the second step, determination of infringement, is a question of fact. Bai v. L & L Wings, Inc., 160 F.3d 1350, 1353 (Fed.Cir. 1998).

The present case is only at the first step. This step requires that the claims be "construed without regard to the accused product." Jurgens v. McKasy, 927 F.2d 1552, 1560 (Fed.Cir. 1991). As the court explained in Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565 (Fed.Cir. 1991):

> In "claim construction" the words of the claims are construed independent of the accused product, in light of the specification, the prosecution history, and the prior

15

art. Of course the particular accused product (or process) is kept in mind, for it is efficient to focus on the construction of only the disputed elements or limitations of the claims. However, the construction of claims is simply a way of elaborating the normally terse claim language: in order to understand and explain, but not to change, the scope of the claim. Id. at 1580.

It is a basic principle of claim construction that claim terms are to be given their ordinary meaning as understood by those in the relevant art. Patent terms do not vary as a result of an adversary's present or prior position as to what the claim words mean. At the time the patent came into existence, the meaning of its claim terms became fixed. A court's construction of the claim language of a patent may be consistent with an adversary's position, but it is not based on that party's contentions. Rather, the construction is based solely on the intrinsic evidence related to the patent, or on extrinsic evidence where necessary. Construction of the '126 patent, therefore, plays no role in the Court's determination as to the proper claim construction of the '773 patent.

The plaintiff further contends that claim construction of the '126 patent is appropriate given the fact that it has asserted causes of action for false marking and false advertising premised on its contention that defendants' fastener, marked as the '126 patent, is not covered by the claims in that patent. "The applicable test [for patent mismarking] is not whether the product sold by the defendant fails to 'read on' the claim of the patent but whether the defendant had an honest belief that the patent covered the articles marked." See, Innovative Concepts in Entm't, Inc. v. Entm't Enters. Ltd., 576 F.Supp. 457, 462 (E.D.N.Y. 1983) (citing Brose v. Sears, Roebuck & Co., 455 F.2d 763 (5th Cir. 1972)). Even if defendants' product is not constructed in accordance with the dictates of the '126 patent claims, defendants cannot be held liable for false marking absent a showing that they knew that the '126 patent did not cover the fastener it

16

marked.

This is also true with respect to plaintiff's claim for false advertising under the Lanham Act. Plaintiff alleges that defendants falsely advertised that defendants' fastener is protected by the '126 patent and implied that plaintiff's rights in the '773 patent need not be respected. Since statements made regarding one's patent rights are conditionally privileged under the patent law, one cannot be held liable for making such statement unless they are made in bad faith. Zenith Elec. Corp. v. Exzec, Inc., 182 F.3d 1340, 1353 (Fed.Cir. 1999); see also, Hunter Douglas, Inc. v. Harmonic Design, Inc., 153 F.3d 1318, 1336 (Fed.Cir. 1998). Therefore, liability may not be imposed under the Lanham Act for false advertising absent a similar showing of bad faith. Zenith Elec. Corp., 182 F.3d at 1353. Statements regarding a duly granted patent are presumed to be made in good faith, and such a presumption can only be overcome by affirmative evidence of bad faith. Springs Window Fashions L.P. v. Novo Indus., L.P., 323 F.3d 989, 999 (Fed.Cir. 2003) (quoting Golan v. Pingel Enter., Inc., 310 F.3d 1360, 1371 (Fed.Cir. 2002). "Consequently, patentees do not violate the rules of fair competition by making accurate representations, and are allowed to make representations that turn out to be inaccurate provided they make them in good faith." Golan, 310 F.3d at 1371 (citation omitted). Patents are statutorily afforded the presumption of validity. 35 U.S.C. § 282. Therefore, defendants' statements, in their advertisements, that their product is patented are not inaccurate in and of themselves. If defendants believed that their product was covered by the '126 patent, their advertising statements would not have been made in bad faith even if such statements are proven to be untrue. Therefore, the proper claim construction of the '126 patent is irrelevant. Defendants' intent is the controlling factor.

Accordingly, in light of the foregoing, determining the claim construction of the '126 patent is unwarranted.

## MOTION TO AMEND

Plaintiff is seeking to amend the complaint to add two additional counts of false advertising. As to the first, plaintiff alleges that after discovery closed, defendants produced documents indicating that the inventor of the '126 patent withheld knowledge regarding prior art from the PTO, and such non-disclosure renders the '126 patent invalid. Plaintiff alleges that despite defendants' knowledge of the invalidity of the patent, they continued to advertise that their product was patented. The second proposed claim is based on defendants falsely advertising that their fastener is manufactured in the United States.

Leave to amend should be freely given when justice dictates. Fed.R.Civ.P. 15(a); Rachman Bag Co. v. Liberty Mut. Ins. Co., 46 F.3d 230, 234-35 (2d Cir. 1995). Nevertheless, denial of such leave may be warranted because of undue delay, bad faith, dilatory motive on the part of the movant, prejudice to the non-moving party, and futility of the proposed amendment. Foman v. Davis, 371 U.S. 178, 182 (1962). The Court finds that it is improper to permit plaintiff to amend the complaint to add either of its two false advertising claims.

The first proposed claim fails to set forth a cognizable cause of action for false advertising. Each person associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the PTO. 37 C.F.R. § 1.56. "A breach of this duty, which breach can include affirmative misrepresentations of material facts, failure to disclose material information, or submission of false material information, coupled with an intent to

18

deceive, constitutes inequitable conduct." Duro-Last, Inc. v. Custom Seal, Inc., 321 F.3d 1098, 1109 (Fed.Cir. 2003) (citing Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed.Cir. 1995)). A patent may be rendered invalid as a result of inequitable conduct. Dayco Prods., Inc. v. Total Containment, Inc., 329 F.3d 1358, 1364 n.3 (Fed.Cir. 2003) (citations omitted). However, an assertion that a patent was procured through inequitable conduct does not state a cause of action for false advertising under the Lanham Act. Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc., 75 F.3d 1568, 1675 (Fed.Cir. 1996). Accordingly, allowing plaintiff to amend the complaint to add such a claim would be futile.

Plaintiff's second proposed amendment, alleging defendants falsely advertised that their product is manufactured in the United States, similarly fails to make out a cognizable claim. Hence, it would be futile to allow this amendment as well. The amendment itself fails to state a viable claim for false advertising. Defendants advertise that their "magnetic snaps are manufactured in Europe, Asia, and the U.S. Wherever you manufacture - just buy [defendants'] magnetic snaps from the nearest authorized distributor . . ." The deposition testimony of the inventor of the '126 patent reveals that he initially testified that the fasteners were not manufactured in the United States. However, he explained that by manufactured, he meant that the stamping and assembly of the magnetic snaps do not occur in this country. He testified that the finishing and packaging of the product does take place in the United States, and that he considers such acts to constitute "manufacturing."

Even if further discovery enabled the plaintiff to show that the fasteners are not produced in the United States, a cause of action for false advertising would still not lie. To establish a claim for false advertising, not only must there be a showing that the advertisement contains a

19

false statement, the false statement must be material. <u>Nat'l Basketball Ass'n v. Motorola, Inc.</u>, 105 F.3d 841, 855 (2d Cir. 1997). The statement at issue herein is not material as it would not affect the consumers' buying decision. The defendants' advertisement indicates that their product is made on three different continents. Thus, the challenged statement is not set forth as an inducement to those customers whose purchases are influenced by an interest in supporting the domestic economy. In fact, the subject advertisement encourages customers to purchase defendants' fasteners at the nearest location, regardless of where that might be. Absent a showing of materiality, the alleged falsity of the statement does not alone support a claim for false advertising.

Accordingly, plaintiff's motion to amend is denied.

Dated: New York, New York
May 11, 2005

SO ORDERED:

*[signature]*
GEORGE B. DANIELS
United States District Judge