UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ADVANCED MAGNETIC CLOSURES, INC.,                    :
                                                     :
                         Plaintiff,                  :          98 Civ. 7766 (PAC)
                                                     :
         - against -                                 :
                                                     :          OPINION AND ORDER
ROME FASTENER CORP., ROME FASTENER              :
SALES CORP., ROMAG FASTENERS, INC.,             :
RINGS WIRE, INC.                                     :
                                                     :
                         Defendants.                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HONORABLE PAUL A. CROTTY, United States District Judge:

At the close of Plaintiff's evidence during the jury trial of this patent infringement

action, the Court granted the motion of Defendants Rome Fastener Corporation, Rome

Fastener Sales Corporation, Romag Fasteners Inc., and Rings Wire, Inc. (collectively

"Romag" or "Defendants") for judgment as a matter of law pursuant to Rule 50(a), Fed.

R. Civ. P. (See Transcript of Trial ("Trial Tr.") 370:22-371:15.)  Romag now moves for

attorney fees and costs from Plaintiff Advanced Magnetic Closures ("AMC" or

"Plaintiff"), urging that this case is "exceptional" pursuant to 35 U.S.C. § 285 because:

(1) AMC's U.S. Patent No. 5,572,773 (the "'773 Patent") issued upon inequitable

conduct before the U.S. Patent and Trademark Office ("PTO"); and (2) AMC engaged in

substantial litigation misconduct throughout the course of this decade-long lawsuit.

Romag also claims that AMC's counsel was complicit in much of the alleged

wrongdoing, from the patent application through the trial.  It argues that AMC's counsel

unreasonably and vexatiously multiplied and unduly prolonged this litigation and should

be held jointly and severally liable for any resulting fee award pursuant to 28 U.S.C. §

1927.  Finally, Romag claims that AMC is a shell corporation lacking assets and seeks to hold its President and owner, Irving Bauer ("Bauer"), as well as his purported corporate alter ego, G. Bauer, Inc.,[1] jointly and severally liable for fees.  In separate opposing memoranda, AMC, Bauer, and Plaintiff's trial counsel, David Jaroslawicz, contend that no fee award is warranted.

For the reasons set forth below, Romag's request for attorney fees is granted as to AMC, granted in part as to AMC's counsel, and denied as to Bauer and G. Bauer, Inc.

## INTRODUCTION

In deciding whether to award fees, a district court must give careful consideration to the litigation as a whole and set forth the reasons for its conclusions in detail to afford a meaningful basis for appellate review. See Superior Fireplace Co. v. Majestic Prods. Co., 270 F.3d 1358, 1377 (Fed. Cir. 2001); see also Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc., 231 F.3d 1339, 1347 (Fed. Cir. 2000) (noting the requirement that a district court must evaluate the "totality of the circumstances" in deciding whether an award of fees is appropriate).  To that end, the Court provides a comprehensive summary of "exceptional" conduct that occurred throughout the almost ten years of this litigation. This ruling presumes familiarity with the opinions of this Court at the summary judgment stage, Advanced Magnetic Closures, Inc. v. Rome Fastener Corp., No. 98 Civ. 7766 (PAC), 2006 WL 3342655 (S.D.N.Y. Nov. 16, 2006) (Advanced II) and 2007 WL 1552395 (S.D.N.Y. May 29, 2007) (Advanced III), which are incorporated by reference. Nonetheless, various references and findings which are set out in detail in the summary judgment opinions are briefly described here.

---

[1] Bauer admitted at trial that he is "G. Bauer." (Trial Tr. 282:7-11.)

By way of introduction, this dispute involves magnetic snap fasteners commonly used in the fashion industry to secure the flaps on ladies' handbags. AMC's principal contention was that the magnetic snap fastener developed, manufactured, and marketed by Romag practices the claims of, and therefore infringes, AMC's '773 Patent. Romag maintains that its fasteners do not infringe any magnetic fastener patents and are instead covered by its own patent, U.S. Patent No. 5,722,126 (the "'126 Patent"). The '773 Patent issued on November 12, 1996. (Plaintiff's Trial Exhibit ("PX") 1.) The '126 Patent followed on March 3, 1998. (Defendants' Trial Exhibit ("DX") AB.) Each patent claims a magnetic fastener with a central hole, but the '773 Patent claims a central hole that <u>increases</u> the magnetic attraction of the fastener[2], while the '126 Patent claims a central hole that both <u>maximizes</u> the magnetic attraction and provides additional manufacturing advantages[3]. The named inventor of the '773 Patent is Bauer, AMC's President and sole owner. The named inventor of the '126 Patent is Howard Reiter ("Reiter"), President of Defendant Romag Fasteners, Inc. and Vice President of the other Romag Defendants.

AMC filed its complaint on October 30, 1998. The case was originally assigned to Judge William H. Pauley III, who handled a number of pretrial motions and discovery matters. On April 18, 2000, the case was reassigned to Judge George B. Daniels, who

---

[2] The relevant portion of the '773 Patent, contained in Claim 1, reads:
> …said magnetic member creates a magnetic circuit which passes at least through a periphery of said first rivet of said female member, with said small hole in said one of said first and second rivets increasing the magnetic attraction of said magnetic member by modifying a resistance to said magnetic circuit at said first and second rivets.

'733 Patent col. 8 *l*.17-23.

[3] Unlike the '773 Patent, the claims of the '126 Patent do not explain the significance of the hole, except that the summary of the invention explains that the central hole "may be used to support the closure half during a coating process" and "to allow a light source (such as an infrared light source, for example) to direct a beam of light through the closure half to help align the closure half while it is being attached to a piece of material." '126 Patent col. 1 *l*.65-66 & col. 2 *l*.9-12. The hole "also maximizes the magnetic attraction force between a male half and a female half of a snap incorporating" either production feature. <u>Id.</u> col. 2 *l*.2-4 & *l*.14-16.

conducted a <u>Markman</u> hearing on claim construction on September 14, 2000.  Judge

Daniels issued his <u>Markman</u> order on May 24, 2005, and then the case was reassigned to

this Court on August 9, 2005.  After the parties' claims were narrowed on summary

judgment, <u>see</u> <u>Advanced II</u>, 2006 WL 3342655, and <u>Advanced III</u>, 2007 WL 1552395,

the case proceeded to trial on November 5, 2007.  On November 7, 2007, at the

conclusion of AMC's evidence, the Court granted Romag's Rule 50 motion on the record

in open court.

**DISCUSSION**

**I.  Claim pursuant to 35 U.S.C. § 285–"Exceptional" Case**

    **A.  35 U.S.C. § 285–Legal Standard**

        In a patent matter, the court may award attorney fees and expenses if the

prevailing party has established by clear and convincing evidence that the case is

"exceptional." 35 U.S.C. § 285; <u>see</u> <u>Digeo, Inc. v. Audible, Inc.</u>, 505 F.3d 1362, 1366-68

(Fed. Cir. 2007).  An "exceptional" case finding may be predicated on various grounds,

such as:  inequitable conduct before the PTO; litigation misconduct; vexatious and

otherwise bad faith litigation; frivolous suit; and willful infringement. <u>See</u> <u>Stephens v.

Tech Intern., Inc.</u>, 393 F.3d 1269, 1273 (Fed. Cir. 2004); <u>Brasseler, U.S.A. I, L.P. v.

Stryker Sales Corp.</u>, 267 F.3d 1370, 1380 (Fed. Cir. 2001).  If the case is exceptional, the

Court then has discretion to determine separately whether fees are warranted, <u>Interspiro

USA, Inc. v. Figgie International Inc.</u>, 18 F.3d 927, 933 (Fed. Cir. 1994), by weighing

factors—including the closeness of the case, the tactics of counsel, and the conduct of the

parties—that contribute to a fair allocation of the burdens of litigation, <u>S.C. Johnson &

Son, Inc. v. Carter-Wallace, Inc.</u>, 781 F.2d 198, 201 (Fed. Cir. 1986).

In the instant action, Romag alleges two subclasses of wrongful conduct that support an exceptional case finding: (1) inequitable conduct before the PTO and (2) litigation misconduct. The Court will address these allegations in turn.

## B. Inequitable Conduct Before the PTO

### 1. Jurisdiction to Assess Inequitable Conduct

Before evaluating the merits of Romag's inequitable conduct allegations, the Court first addresses a threshold jurisdictional question: Did Romag divest the Court of jurisdiction to adjudicate its inequitable conduct claim at the fee stage by withdrawing its counterclaim—which was based, in part, on inequitable conduct[4]—after the entry of judgment as a matter of law? After issuing its Rule 50 decision on the record, the Court inquired as to Romag's intentions regarding the lone remaining claim—its counterclaim for declaratory relief. Romag's counsel, Norman Zivin, responded:

> Your Honor, I think that we have one counterclaim for declaratory judgment. In view of your Honor's ruling on [the] Rule 50(a) motion, we would withdraw that counterclaim. We believe that terminates any further need for a jury in this case.
> We do believe, however, your Honor, that we are entitled to attorney's fees for the defense of this case. We would like to make a showing. I think I could use a little bit of additional evidence to show inequitable conduct by Mr. Bauer in front of the patent office. This is not testimony that the jury needs to hear because it is a decision that is made by your Honor as to whether the conduct is inequitable and whether attorney's fees can be granted. We believe that the jury can be dismissed and we would be prepared this afternoon to put on some brief expert testimony for your Honor's use in considering that application.

(Trial Tr. 371:18-372:8.) AMC argues, in effect, that having dropped its inequitable conduct counterclaim, Romag is not entitled to a second bite of the apple at the fee stage.

---

[4] Romag sought a declaratory ruling that, inter alia, "[t]he applicant [Bauer] did not invent the subject matter sought to be patented [i.e., the snap that issued as the '773 Patent]." (See Defendants' Answer to Complaint and Counterclaim of Defendant Romag Fasteners, Inc., Aff. Def. ¶ 5(d) & Counterclaim ¶ 15(d).)

AMC relies on language in <u>Sony Electronics, Inc. v. Soundview Technologies, Inc.</u>, where the court found it inappropriate to use "Section 285 as an independent source of jurisdiction for the otherwise <u>moot</u> inequitable conduct issue." 375 F. Supp. 2d 99, 102 (D. Conn. 2005) (emphasis added).  This reliance is misplaced.  In an earlier opinion, the <u>Sony</u> court determined that the plaintiff's declaratory judgment claim of inequitable conduct had been mooted because the patent, which was found to be not infringed at the appellate level, had expired in the interim.  <u>See</u> <u>Sony Electronics, Inc. v. Soundview Techs., Inc.</u>, 359 F. Supp. 2d 173, 176 (D. Conn. 2005).  Here, by contrast, AMC maintains its right to appeal the Court's final decision in this matter and there is no evidence before the Court that the '773 Patent has expired.  Thus, despite the Court's Rule 50(a) determination that AMC failed to substantiate its infringement claim as a matter of law, Romag maintains an ongoing interest in its inequitable conduct claim given its exposure either on appeal or to future infringement claims if it continues to develop and market similar magnetic snap products.  <u>Cf.</u> <u>Cardinal Chem. Co. v. Morton Int'l, Inc.</u>, 508 U.S. 83, 96 (1993) ("Merely the desire to avoid the threat of a 'scarecrow' patent, in Learned Hand's phrase, may therefore be sufficient to establish jurisdiction under the Declaratory Judgment Act.").

In addition, under recent Federal Circuit precedent, a district court retains independent jurisdiction over a prevailing party's § 285 request for attorney fees.  <u>See</u> <u>Monsanto Co. v. Bayer Bioscience N.V.</u>, 514 F.3d 1229, 1242 (Fed. Cir. 2008) (<u>Monsanto II</u>); <u>Highway Equip. Co. v. FECO, Ltd.</u>, 469 F.3d 1027, 1033 n.1 (Fed. Cir. 2006).  This jurisdiction to award fees encompasses the jurisdiction to make findings of inequitable conduct, even where the parties no longer maintain a justiciable claim under

the federal patent laws. See Monsanto II, 514 F.3d at 1242 (citing Brasseler, U.S.A. I,

267 F.3d at 1380). Thus, while the entry of a covenant not to sue for infringement divests

a trial court of jurisdiction over a declaratory judgment action, see, e.g., Amana

Refrigeration, Inc. v. Quadlux, Inc., 172 F.3d 852, 855 (Fed. Cir. 1999), district courts

retain jurisdiction to assess attorney fees predicated on the allegations of inequitable

conduct identical to those contained in the non-justiciable counterclaim, Highway

Equipment, 469 F.3d at 1033 n.1 ("While the covenant [not to sue for infringement] may

have eliminated the case or controversy pled in the patent-related counterclaims and

deprived the district court of Article III jurisdiction with respect to those counterclaims,

the covenant does not deprive the district court of jurisdiction to determine the

disposition of . . . the request for attorney fees under 35 U.S.C. § 285." (internal citation

omitted)).

     As a practical matter, it makes no difference whether the Court assesses

inequitable conduct at the fee, rather than the trial, stage. If a court concludes at any

stage of the proceedings that a party obtained a patent by way of inequitable conduct,

then the patent is automatically deemed unenforceable. See Monsanto II, 514 F.3d at

1243 (citing Kingsdown Med. Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 877 (Fed.

Cir. 1988) (en banc in pertinent part)). In addition, as Romag's counsel suggested when

withdrawing the counterclaim, "[i]nequitable conduct is an equitable issue committed to

the discretion of the trial court." Flex-Rest, LLC v. Steelcase, Inc., 455 F.3d 1351, 1357

(Fed. Cir. 2006). There was no need to raise facts bearing on that claim before the jury.

In that sense, Romag mischaracterized its action as a "withdrawal" of the counterclaim;

rather, it merely adjusted its presentation of evidence as to inequitable conduct when the

phase of litigation shifted from jury trial to equitable assessment. Finally, it would undermine the Court's oft-stated responsibility to evaluate the "totality of the circumstances" in determining whether fees are warranted, Yamanouchi, 231 F.3d at 1347, if the Court could not consider Romag's inequitable conduct allegations.

Therefore, the Court is assured of its jurisdiction and proceeds to assess the merits of Romag's claim for attorney fees under 35 U.S.C. § 285.

### 2. Legal Standard

"Inequitable conduct is a . . . defense to patent infringement and, either alone or in conjunction with trial conduct, may constitute the basis for an award of attorney fees under 35 U.S.C. § 285." Pharmacia & Upjohn Co. v. Mylan Pharms., Inc., 182 F.3d 1356, 1359 (Fed. Cir. 1999) (quoting A.B. Chance Co. v. RTE Corp., 854 F.2d 1307, 1312 (Fed. Cir. 1988)). "To hold a patent unenforceable for inequitable conduct, a district court must find by clear and convincing evidence that a patent applicant breached its duty of candor and good faith to the United States Patent and Trademark Office . . . by failing to disclose material information, or submitting false material information, with an intent to deceive the PTO." Monsanto II, 514 F.3d at 1233-34 (citing Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs. Ltd., 394 F.3d 1348, 1351 (Fed. Cir. 2005) and Kingsdown, 863 F.2d at 872); see also Monsanto Co. v. Bayer Bioscience N.V., 363 F.3d 1235, 1239 (Fed. Cir. 2004) (Monsanto I) ("explaining that inequitable conduct can be found when the 'applicant omitted or misrepresented material facts with the intention of misleading or deceiving the patent examiner'"). "Once the requisite levels of materiality and intent have been proven, a district court 'must balance the equities to determine

whether the patentee has committed inequitable conduct that warrants holding the patent unenforceable.'" <u>Monsanto II</u>, 514 F.3d at 1234 (quoting <u>Monsanto I</u>, 363 F.3d at 1239).

### a. Materiality

Information is material and must be disclosed if a reasonable patent examiner would find such information important in deciding whether the proposed claims are patentable. <u>Digital Control, Inc. v. Charles Mach. Works</u>, 437 F.3d 1309, 1314-16 (Fed. Cir. 2006). In examining materiality, the Federal Circuit relies on the definition provided in 37 C.F.R. § 1.56, which states that information is material to patentability when:

> [I]t is not cumulative to information already of record or being made of record in the application, and
> (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
> (2) It refutes, or is inconsistent with, a position the applicant takes in:
> (i) Opposing an argument of unpatentability relied on by the Office, or
> (ii) Asserting an argument of patentability.

37 C.F.R. § 1.56(b); <u>see</u> <u>Bruno</u>, 394 F.3d at 1352.

### b. Intent

"Intent need not, and rarely can, be proven by direct evidence." <u>Merck & Co., Inc. v. Danbury Pharmacal, Inc.</u>, 873 F.2d 1418, 1422 (Fed. Cir. 1989). "Rather, in the absence of a credible explanation, intent to deceive is generally inferred from the facts and circumstances surrounding a knowing failure to disclose material information." <u>Bruno</u>, 394 F.3d at 1354 (citing <u>Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.</u>, 984 F.2d 1182, 1193 (Fed. Cir. 1993)). The court must assess evidence of the patentee's overall conduct, including its good faith, or lack thereof. <u>Ulead Sys., Inc. v. Lex Computer & Mgmt. Corp.</u>, 351 F.3d 1139, 1146 (Fed. Cir. 2003).

### c. The Balancing Test

"As a general principle, materiality and intent are balanced—a lesser quantum of evidence of intent is necessary when the omission or misrepresentation is highly material, and vice versa." Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1358 (Fed. Cir. 2003); see Digital Control, 437 F.3d at 1315-16. "At the same time, however, there must be some threshold showing of intent to be balanced; [courts] will not find inequitable conduct on an evidentiary record that is completely devoid of evidence of the patentee's intent to deceive the PTO." Amgen, 314 F.3d at 1358.

### 3. Romag's Allegations of Inequitable Conduct

Romag alleges that those charged under the patent laws with the duty of candor before the PTO in connection with the '773 application failed to disclose: (1) a dispute concerning the inventorship of the '773 snap; and (2) an on-point, prior Board of Appeals decision that controverted the claimed novelty of the '773 snap. Romag contends that the applicants—including Irving Bauer—were well aware of this information and intentionally withheld it to avoid any obstacles to the issuance of the patent, which was central to their business objectives.

### a. The Inventorship of the '773 Snap

### i. The Patent Application

The '773 Patent application, which named Irving Bauer as the first and sole inventor of the hollow rivet magnetic snap, was filed on February 15, 1995 by Bauer's patent attorney, David Novais ("Novais") of Oblon, Spivak, McClelland, Maier & Neustadt, P.C. ("Oblan, Spivak"). (See PX-2, '773 Patent File at 4.) The PTO's file for the '773 Patent also contains several documents signed by Bauer under penalty of

perjury, which attest to his inventorship of what became the '773 snap. (See PX-2, "Verified Statement (Declaration) Claiming Small Entity Status" at 34; PX-2, "Declaration, Power of Attorney and Petition" at 37.)

### ii. Discussion of Inventorship at the Summary Judgment Stage

Romag has long maintained that the true inventor of the '773 Patent is not Bauer but Robert Riceman ("Riceman"), and that the naming of Bauer was a deliberate fraud on the PTO. The Court undertook an extensive analysis of the evidence marshaled in support of both the Bauer and Riceman inventorship claims at the summary judgment stage. See Advanced III, 2007 WL 1552395, at **2-4. AMC had moved for summary judgment on Romag's affirmative defense and counterclaim to the extent they were based on lack of inventorship. See 35 U.S.C. § 102(f) ("A person shall be entitled to a patent unless . . . he did not himself invent the subject matter sought to be patented."). The Court concluded that "a reasonable fact-finder could find that Riceman's claim of inventorship is proved by clear and convincing, corroborated evidence." Advanced III, 2007 WL 1552395, at *5. At that time, all inferences were drawn in favor of Romag as the non-moving party. Id. The Court did not make a definitive ruling on inventorship, concluding only that existing factual questions and credibility determinations ruled out summary judgment. Id. at *6. Since Romag relies here on many of the same allegations it put forth in a defensive posture at the summary judgment stage, the Court's findings of fact and analysis are incorporated for the purposes of the present discussion.

### iii. Bauer's Investment in the Magnetic Snap Business

The competing inventorship claims are inextricably tied to Bauer's initial interest in the magnetic snap industry.[5] At trial, Bauer testified that, in the summer of 1992, an acquaintance, Alexander Fischer, asked Bauer to finance the acquisition of various magnetic snap assets by a corporation owned by Fischer. (Trial Tr. 248:19-248:25.) Fischer got the idea from his new employee Riceman[6], who had previously worked as a manager for Mitchell Medina ("Medina") at the Randolph-Rand Corporation ("RRC"). (Trial Tr. 287:13-288:13.) RRC held the rights to the industry standard magnetic snap, U.S. Patent 4,021,891 (the "'891 Patent") (DX-A). (See DX-AT, Purchase Agreement at 2.) On July 11, 1993, a year after Fischer first approached Bauer, Amsco Products, Inc., a New York corporation created by Fischer for the purposes of the transaction, acquired the magnetic snap business, including all rights and interests under the '891 Patent, from RRC. (DX-AT; Trial Tr. 249:9-10.) Fischer and Bauer also purchased the rights to U.S. Patent No. 4,453,294 (the "'294 Patent") (DX-E) from inventor Tamao Morita, though the parties have not submitted a written contract memorializing that purchase. (Trial Tr. 249:11-15, 251:24-25.) These patent rights were assigned to a new entity called the Randolph-Rand Corporation of New York ("RRNY") (Id. 288:14-24.)

By purchasing the '891 and '294 Patents, both of which describe a snap with a solid, center post, Bauer and Fischer sought to dominate the magnetic snap market for the foreseeable future. (See id. 251:13-253:19.) While the industry standard '891 Patent was

---

[5] Bauer testified at trial that he did not graduate from high school but attended a trade school where he learned to repair and install oil burners. (Trial Tr. 247:14-19.) He is licensed to repair oil burners, owns an oil burner installation and service business, a building supply business, an oil company, and various real estate investments. (Id. 247:20-248:4.)

[6] At trial, Bauer stated that Fischer initially hired Riceman to help market Fischer's patent-protected suspender clip product. (Trial Tr. 287:19-23.)

slated to expire in a few years, the '294 had a much longer lifespan and would apparently become the primary enforceable asset once the '891 did, in fact, expire. (See id. 252:12-16, 288:7-13.)[7] Bauer and Fischer's magnetic snap hegemony was jeopardized sometime between October 1993 and July 1994, however, when the handbag industry, led by the intellectual property law firm of Darby & Darby, announced that it had designed around the '294 Patent and began soliciting manufacturers to patent and produce its non-infringing alternative.[8] (See DX-BK, Deposition of Robert Riceman 109:1-111:5.) In short, Bauer and Fischer invested heavily in a patent that might soon be worthless.

As explored in much greater detail in the Court's summary judgment opinion, the Riceman and Bauer versions of what happened next diverge sharply. Riceman, who was working in some capacity for RRNY at this time, claims he told Bauer and Fischer that he had a 1992 design that predated the Darby & Darby drawing. (Id.) He maintains that Bauer and Fischer decided to patent his design to preserve their investments in the snap industry. Riceman claims that Bauer did not want him to be named as an inventor because, by the terms of Riceman's consulting agreement with RRC, the invention would be owned by Medina. (Id. 52:20-53:8.) Bauer, meanwhile, has long maintained, and testified at trial, that he only hired Riceman as a draftsman to ready Bauer's 1992 design for application to the PTO and, for that purpose, instructed Riceman to work with his patent counsel, Novais. (Trial Tr. 289:17-290:13, 305:13-23.)

---

[7] At trial, Howard Reiter attested to the market dominance of the '891 Patent. He described "Randolph-Rand" as the "the dominant supplier" of snaps in the industry and stated that Romag only contemplated selling its own snaps once the RRC/RRNY-owned '891 Patent was set to expire sometime in 1994. (Trial Tr. 220:24-222:14.) In addition, Bauer testified that Fischer told him that RRC was "the largest in New York selling these enforcing [sic] this patent. Everybody has—every woman carries a pocketbook that has a snap." (Id. 259:15-17.)

[8] In a diary entry dated May 18, 1994, Reiter wrote that a partner from Darby & Darby offered to sell him a non-infringing magnetic snap design that he could then develop into a viable patent application. (DX-T at 19.) Reiter declined. (Id.)

### iv. The Bauer Trial Testimony & Documentary Evidence

At trial, Bauer testified at length about the events surrounding his claimed inventorship. This was the first extended discussion by Bauer regarding his development of the '773 snap. At his deposition on August 3, 1999, Bauer was unable or unwilling to articulate the claimed invention. (Declaration of Wendy E. Miller ("Miller Decl.") Ex. 1, Deposition of Irving Bauer ("Bauer Dep.") at 41:1-42:7, 43:15-47:15.)[9]

Bauer conceded that he initially did not understand the magnetic snap patents that Fischer asked him to finance. (Trial Tr. 249:16-18.) He stated: "I never had a patent. I don't know what a patent is . . . ." (Id.) At this point, Bauer claims he undertook to learn as much as he could about the products in which he was about to invest "a million dollars." (Id. 254:19-23.) He borrowed a number of snaps from Fischer and retired to his work shop to "understand how the product operates." (Id. 254:24-256:1.)

Bauer claimed he was eventually prompted to develop a new magnetic snap fastener design sometime in 1992 when, having reviewed the relevant patents and

---

[9] Bauer had the following exchange at his deposition:
> Q. Please tell us in your own words what was the tremendous idea?
> A. I can't tell you in words. You have to read through this, my patent attorney put it down in writing, there are a lot of pages involved and it cannot be given to you just like that.
> Q. Mr. Bauer, you are the named inventor, is that correct?
> A. That is correct.
> Q. What did you think your invention was?
> A. A tremendous idea for a new kind of magnetic snap.
> Q. What was the tremendous idea?
> A. If you read the patent.
> Q. I am asking you in your own words.
> A. I cannot give it to you in my own words.
> Q. You can not tell me?
> A. I cannot tell you in plain words. It is in here, if you read it. It is spelled out, nicely typewritten, it can be read and possibly it can explain it in good detail so I prefer you read it, you find it.

(Bauer Dep. 41:9-42:6.) The Court noted Bauer's inability "to explain the features of his invention" at his 1999 deposition in its summary judgment opinion of May 29, 2007. Advanced III, 2007 WL 1552395, at *2. AMC submits that Bauer's reticence was explained by the absence of a confidentiality order at the time the deposition was taken (see Pl.'s Opp'n to Defs.' App. for Att'y Fees & Expenses ("Pl.'s Opp'n") 5 n.4), but is a contrivance. There is certainly no reference to confidentiality in the deposition transcript.

examined the snaps, he realized the relative ease with which a competitor could design around one of Fischer's targeted purchases: the '294 Patent. (<u>Id.</u> 254:24-255:3, 259:8-12.) Even though he admitted that he knew nothing about either patents or snaps in 1992, Bauer would nonetheless have the Court believe that he embarked upon his invention to protect an investment he had not yet made. He claimed that he "started taking apart the snap that [Fischer] had given" him and wondered, "Why does it have to be solid?" (<u>Id.</u> 255:24-256:4.) He testified that he conducted an assortment of magnetic strength tests by drilling holes in sample snaps. First, he compared the magnetic attraction of hollow rivet snaps to that of solid rivet snaps, initially with a paper clip, and then with steel ball bearings. (<u>Id.</u> 256:9-18.) He claims that the hollow snaps were stronger, though admitted that he could not understand why. (<u>Id.</u> 256:19-24.) Next, he provided a difficult-to-follow explanation about another strength test:

> THE COURT: You put nails on the wall?
> THE WITNESS: I took a nail, the head of the nail, and I drilled a hole in the back of the nail and I put it on [a flat magnetic plate attached to the wall]. And I took a piece of copper tubing and I cut round rings, as a weight. I used three pieces of weight, and I put it through the end of the nail. The one with the whole was holding—
> THE COURT: —greater weight.
> THE WITNESS: —greater weight. The one without the hole tipped over.

(<u>Id.</u> 258:1-10.) Finally, he explained:

> So I started taking the marble steel balls, putting it on the paper with a line, lined paper. So I didn't need anything else. I just started moving the snap closer to the ball. The one with the hole, the ball was coming from a further distance. So right away I saw that I'm doing something here. And the bigger hole—I made a real big hole and it didn't pull at all. It was much weaker. So I know I can't make a large hole. It has to be a small hole.

(<u>Id.</u> 258:25-259:7.)

Based on this handiwork, conducted approximately one year before he and Fischer completed their purchase, Bauer conveyed his idea for a hollow rivet snap to Fischer. (Id. 254:19-255:3, 259:8-12.) Though Fischer was initially skeptical about Bauer's design and its ability to circumvent the '891 and '294 Patents, Bauer claims that Fischer realized "there is something out there because I showed him my nail." (Id. 260:2-3.) Bauer then testified that he and Fischer met at Fischer's house on September 6, 1992, where Bauer showed Fischer his hollow rivet snap and sketched his idea for his partner. (Id. 260:20-23, 263:5-21, 266:12-267:3, 272:11-14.) A very poor, essentially illegible copy of these sketches was submitted at trial. (PX-21; Trial Tr. 266:14-16.) AMC also submitted a copy of the copy of the original sketch on which additional notations were made, most of them apparently restating, in clearer block letters, the original notations. (PX-22.) Bauer testified that he created the enhanced, legible copy in 2004 after the original (PX-21) was partially destroyed in a flood. (Trial Tr. 267:15-268:6, 270:11-271:21.) Bauer testified that the notation in the top right corner marks the date as "9/6/92."[10] (Trial Tr. 266:14-16, 272:11-14.) Bauer conceded at trial that these sketches—which are the only contemporaneous evidence of his inventorship—fail to disclose the only allegedly patentable feature of Claim 1: a hole which causes an increase in magnetic attraction. (Trial Tr. 344:16-345:9.)

---

[10] At trial, AMC attempted to corroborate Bauer's date by introducing what was purported to be an entry from Fischer's diary dated September 6, 1992. (Trial Tr. 273:17-21; PX-23.) The Court sustained Romag's objection to its submission, noting "Mr. Fischer can offer his own diary." (Trial Tr. 273:22-25.) Fischer never testified to corroborate Bauer's testimony regarding his invention. In its opposition brief, AMC notes without explanation that Fischer is "medically incapacitated." (Pl.'s Opp'n 22.)

The Court found Bauer's testimony regarding his purported invention completely incredible. At no point in Bauer's rambling, often-incoherent testimony[11] did he offer any scientific or technical explanation for the claimed increase in magnetic attraction caused by the hollow post. Nor did he present any evidence to substantiate this claim. See infra Discussion Part I.C.2. The Court refuses to believe that Bauer, lacking any training or experience in the field, and equipped only with curiosity and pluck, was able to successfully design around the industry standard '294 Patent. His testimony bore clear indicia of fabrication. While voluble—if not responsive—on direct, he was evasive and argumentative on cross examination. The Court is convinced beyond a shadow of a doubt that Bauer could not be the inventor of the '773 snap.

At times, Bauer completely contradicted himself. For instance, Bauer initially testified that, when Fischer first pitched his investment plan, he "never had a patent" and did not "know what a patent [was]." (Trial Tr. 249:16-18.) Later, however, he testified that he has "a lot of patents," including one describing a slide lock for a manual reset boiler. (Id. 262:6-10.) Yet AMC never explained this contradiction nor submitted patents articulating other Bauer inventions at trial.

Bauer also has a dubious timeline. If he realized that he had a product that could circumvent the '294 Patent—the design that, going forward, was the key to his entire investment—it made no sense to actually purchase that patent from Morita. He could simply have patented his non-infringing snap and offered manufacturers a market alternative. Incredibly, Bauer appears to have recognized this fact. On the "enhanced" copy of his September 6, 1992 design sketch for Fischer, Bauer purportedly wrote:

---

[11] At one point, while describing various improvements he had made to machinery used in his boiler repair business, Bauer stated, "I can go on and on." (Trial Tr. 261:17-18.) Even a casual reading of the trial transcript demonstrates that Bauer lived up to this claim.

"HOLE IN MIDDLE RIVIT [SIC] DON'T PAY FOR 294 TO MITCH." (PX-22.)

Setting aside Bauer's mistake—Morita, not Medina, owned the '294 Patent—the notation makes no sense given Bauer's subsequent financing of the '294 purchase. The reality, of course, is that Bauer did not have an idea for a non-infringing, hollow rivet snap at the time he purportedly sketched his idea for Fischer; he only fraudulently "conceived" of the idea, after it became apparent that his investment in the '294 Patent was worthless and he needed a viable substitute.

Nor was AMC forthright with regard to the documentary evidence offered at both the summary judgment stage and trial to substantiate the Bauer inventorship claim. For instance, Bauer admitted at trial for the first time that he personally drafted the November 10, 1993 invoice from A-C La Cava (PX-24), a machine parts manufacturer, which demanded payment for the creation of several magnetic snap prototypes. (Trial Tr. 275:17-19.)[12] AMC has also conceded that an August 25, 1994 invoice from Oblon Spivak, allegedly for preparing and filing the '773 Patent application (PX-28), was a reconstruction, though only after Romag identified the document's defect in its summary judgment reply brief. (Trial Tr. 279:19-281:4.)[13] While AMC has offered explanations for the questionable sourcing of these documents, it did so only when their authenticity was called into question. AMC's "hide the ball" tactics in the course of litigation suggest to the Court that Bauer was simply up to his old tricks, concealing the truth in order to preserve his interest in the '773 Patent and the magnetic snap industry.

---

[12] The Court referred to the La Cava invoice in its summary judgment opinion. See Advanced III, 2007 WL 1552395, at *2.

[13] The Court summarized AMC's explanation for the discrepancy—the inclusion of the '773 Patent number on an invoice supposedly prepared long before the patent issued with that number—in its summary judgment opinion. See Advanced III, 2007 WL 1552395, at *3 & n.4.

There is absolutely no rational explanation for how Bauer could invent something when he admittedly knew nothing about either patents or snaps, especially when he lacked any commercial motivation to invent at the time. It is also significant that the claim of inventorship was not pursued until 1994, when it became apparent that the fashion industry, through Darby & Darby, was actively seeking to design around the '294 Patent, thereby threatening Bauer's investment. At that time, Bauer had a million reasons to claim someone else's invention as his own.

### v. Inequitable Conduct Determination

As the <u>sine qua non</u> of American patent law, inventorship is highly material to patentability. <u>See</u> <u>Bd. of Educ. ex rel. Bd. of Trustees of Fla. State Univ. v. Am. Bioscience, Inc.</u>, 333 F.3d 1330, 1344 (Fed. Cir. 2003) ("[P]atents have in the past been held unenforceable for failure to correctly name inventors in cases where the named inventors acted in bad faith or with deceptive intent.") (citations omitted); <u>PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.</u>, 225 F.3d 1315, 1321 (Fed. Cir. 2000) (noting that inventorship is material to patentability, because an examiner must reject an application if the applicant did not invent the subject matter sought to be patented). Bauer's application concealed the most critical information: he was not the inventor he claimed to be.

Moreover, this fundamental failure to abide by the duty of disclosure creates a strong inference of intent. <u>See</u> <u>Cargill, Inc. v. Canbra Foods, Ltd.</u>, 476 F.3d 1359, 1367 (Fed. Cir. 2007) ("[A] high degree of materiality, coupled with evidence that the applicant should have known of that materiality, creates a strong inference of an intent to deceive."). Indeed, evidence of Bauer's motivation is in no short supply. It was in

Bauer's best interest to fend off looming competition in the market by claiming the '773 design for himself, thereby preserving the market dominance he and Fischer had purchased little more than a year earlier.

Bauer's deliberate misconduct in claiming the invention as his own set in motion the entire chain of events driving this litigation. Accordingly, equity commands the invalidation of the '773 Patent for inequitable conduct.

### b. Non-Disclosure of the '294 Board of Appeals Decision

Having determined that the '773 Patent issued through inequitable conduct, the Court need not address Romag's second posited ground for such a finding—that the '773 applicants failed to disclose the contents of a relevant prior decision of the Board of Patent Appeals and Interferences ("Board of Appeals"). If the Court were required to decide solely on the basis of this allegation, however, no inequitable conduct would lie. While, on first glance, the prior decision to which Romag refers suggests that the hollow rivet in the '773 Patent might actually decrease magnetic attraction, a closer reading demonstrates that Romag is comparing apples to oranges: the '773 snap has a significantly different structural design and its claims focus on different physical attributes. Accordingly, the Court could not conclude in this instance that Romag has demonstrated by clear and convincing evidence the applicants' failure to disclose information material to the '773 Patent application.

### C. Litigation Misconduct

Romag also claims that it should be awarded reasonable attorney fees and expenses in view of AMC's alleged litigation misconduct. Specifically, Romag contends that AMC: (1) relied on an inaccurate expert report while concealing its knowledge of

that inaccuracy; and (2) pursued this case through trial without evidence to support its claims.    AMC counters that Romag's allegations of litigation misconduct are either unsupported by fact or are overexaggerated so as to create a basis for an extraordinary case finding.

"Litigation misconduct and unprofessional behavior are relevant to the award of attorney fees, and may suffice to make a case exceptional under § 285." Sensonics, Inc. v. Aerosonic Corp., 81 F.3d 1566, 1574 (Fed. Cir. 1996) (citing, inter alia, Spectra-Physics, Inc. v. Coherent, Inc., 827 F.2d 1524, 1537 (Fed. Cir.), cert. denied, 484 U.S. 954, 108 S. Ct. 346, 98 L. Ed. 2d 372 (1987)).  In making this assessment, the district court should take into account offensive litigation tactics, including vexatious or unjustified litigation or frivolous filings, and any indicia that the losing party litigated in bad faith. See Superior Fireplace, 270 F.3d at 1377-78; Brasseler, U.S.A. I, 267 F.3d at 1380; Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1481-82 (Fed. Cir. 1998).

While "[t]he law recognizes a presumption that the assertion of a duly granted patent is made in good faith," Springs Window Fashions LP v. Novo Indus., L.P., 323 F.3d 989, 999 (Fed. Cir. 2003) (internal quotation omitted), the Court has already determined that the '773 Patent is invalid given the misattribution of inventorship.  Even if the inequitable conduct ruling is set aside, however, several litigation decisions made by AMC and its counsel compel the determination that this case is extraordinary and attorney fees are merited.

### 1. The Expert Report and Undisclosed Testing

In support of its August 16, 1999 preliminary injunction motion,[14] AMC submitted the expert declaration of Dr. Dev Ratnam ("Ratnam"), dated August 23, 1999, containing his opinion that the hole in the rivets of Romag's accused magnetic snap fastener causes an increase in magnetic attraction. On February 28, 2006, AMC served Ratnam's Expert Report (the "Ratnam Report"), pursuant to Rule 26 of the Federal Rules of Civil Procedure. The report restated his opinion, but added that this opinion was based on a magnetic finite element analysis ("FEA").[15] (Miller Decl. Ex. 13, "Supplemental Expert Report of Dev Ratnam" at 9.) The Ratnam Report did not disclose that the FEA Analysis was conducted by a third party, an individual residing in Kentucky named Brian Bell.

AMC, by its counsel, knew about Bell's tests as early as February 11, 2006, when, in an email to Anthony J. DiFilippi, Esq. of Abelman, Frayne & Schwab, Ratnam requested $1,000 in funds for FEA tests performed by his "consultant engineer." (DX-BP at 2.) Later, in an email to DiFilippi dated April 14, 2006, Ratnam sent an invoice in the amount of $1,500 for "additional work with Mr. Brian Bell and more Field Analysis data." (Id. at 1.) Yet, at no time until compelled by the Court did AMC identify Bell or produce documents concerning his tests, as required by Rule 26(a)(2)(B)(ii), Fed. R. Civ. P.[16]

---

[14] AMC eventually withdrew its motion without prejudice as noted in the December 15, 1999 Order of Judge William H. Pauley III (see Dkt. 56) and the relevant documents were stricken from the record.

[15] Finite element analysis is a computer simulation technique used to model the real-world behavior of physical structures. As with any mathematical analysis, the parameters applied to the mathematical model will affect the results.

[16] Romag also claims that AMC failed to produce information regarding the Bell analysis in response to Romag's Document Request No. 37, which allegedly sought "[a]ll documents upon which each person plaintiff intends to call as a witness (fact or expert) has prepared, relied upon or considered in connection

On June 1, 2006, AMC submitted the Ratnam Report to the Court in support of its opposition to Romag's motion for summary judgment, to create an issue of fact regarding Romag's non-infringement defense and counterclaim for declaratory relief. AMC stated that the Romag product had "been tested by AMC's expert and he has concluded that the presence of the central hole in the closure enhances the magnetic attraction between the closure parts." (Pl.'s Mem. Opp'n Defs.' Mot. for Summ. J., May 23, 2006 at 10, Dkt. 94.) The Court ultimately found that the infringement issue turned on a factual question and denied Romag's motion for summary judgment. See Advanced III, 2007 WL 1552395, at *8.

Ratnam identified Bell to Romag for the first time during his deposition on September 20, 2007.[17] The following day, Romag requested production of all of Ratnam's communications with Bell. (Miller Decl. Ex. 8.) AMC did not produce the requested documents; instead, it advised on October 5, 2007 that it was withdrawing Ratnam as an expert in this case, citing "irreconcilable differences" between Ratnam and AMC's trial counsel, David Jaroslawicz, Esq. (Miller Decl. Ex. 9, erroneously dated as Feb. 23, 2007 and corrected by hand.)

Romag repeated its request for the production of the Ratnam communications, which AMC only produced after the Court ordered it to do so during the pretrial conference on October 23, 2007. (See Miller Decl. Ex. 10, Hearing Tr. 6:13-22.) At the same pretrial conference, AMC's counsel twice denied knowledge of Bell's tests, stating:

> MR. JAROSLAWICZ: Part of the problem is we were never given that testing and were unaware of it. (Id. at 5:7-8.)

---

with their testimony." Romag has not provided a copy of its request for the production of documents for the Court's verification in connection with the present motion.

[17] The Court cannot verify Romag's assertion as the parties have not submitted a transcript of the Ratnam deposition.

. . .

> MR. SCHWAB: . . . But you do understand that where that has put us because of the difficulty of Mr. Ratnam disclosing a third-party testing that one could suggest that hypothetically we didn't know about until he opened his mouth at his deposition . . . . (Id. at 12:16-20.)

These are misrepresentations of fact. Ratnam had told AMC's counsel about Bell's tests at least twice as evidenced by his emails to DiFilippi discussed supra.

Romag received some of Ratnam's communications with Bell on October 30, 2007, only five days before trial. One such document shows that Bell's test results contradict Ratnam's opinion. (DX-BP at 3.) In an undated memorandum, Bell told Ratnam that he reran his analysis and advised, "The results were the same, the no hole part had the most force. . . . This does not help your case . . . ." (Id.) In essence, Bell indicated that his scientific analysis revealed the exact opposite of what Bauer, Ratnam, and the '773 Patent claimed—that, in fact, a snap without a hole exhibited increased magnetic attraction.

Romag took Bell's deposition on November 7, 2007, while the trial was ongoing. Bell testified that the collection of documents produced by Plaintiff was not a complete set of his communications with Dr. Ratnam. (Miller Decl. Ex. 12, Deposition Transcript of Brian Bell ("Bell Dep.") at 16:24-17:3.) He also testified that the undated memorandum in which Bell advised Ratnam that his test results did not support Ratnam's opinion (DX-BP at 3) was contained in an email message which he apparently sent to Ratnam in February or March of 2006. (Bell Tr. 12:7-14:2.)[18] Romag contends that Bell's testimony in this regard supports an inference that AMC deliberately removed the time stamp on Bell's email to conceal from Romag that Bell sent his contradictory test results to Ratnam approximately eighteen months before his withdrawal as an expert.

---

[18] Page 3 of DX-BP corresponds to Exhibit BZ-2 marked and discussed at Bell's deposition.

Bell testified that his initial FEA analysis, which he conducted between December 2005 and February 2006, did not provide the results that Ratnam was hoping for, and Ratnam asked Bell to review his computer model. (Bell Tr. 10:1-4, 11:6-22, 12:6-8, 16:8-23.)  Ratnam and Bell determined that the computer model did not accurately represent the component parts of the magnetic snap fastener. (<u>Id.</u>)  Bell adjusted the model and reran the test in March 2006. (<u>Id.</u> 17:10-14)  The results were the same, as he reported to Dr. Ratnam in his memorandum. (<u>See</u> DX-BP at 3; Bell Tr. 16:8-23.)

AMC contends that the Bell tests, in fact, do not contradict Ratnam's conclusions. Here, the offered explanation is that there are two ways force can be applied to open a magnetic snap:  a straight (or axial) pull or an oblique or angular separation.  As Romag's expert, Dr. James Livingston, testified at his September 19, 2007 deposition, the force that typically opens a snap on a handbag is the oblique force. (<u>See</u> DiFilippi Decl., Ex. 2 ("Livingston Tr.") at 63:5-7.)  AMC points to Ratnam's statement that:

> When I reexamined the magnetic lock closures in the actual use on a leather handbags [sic], it was apparent to me that the dislodging of the snap by pulling a tab having the male part of the snap is not an axial pull, but the pull is oblique and the mating snap breaks off from the top edge. An axial pull will dislodge the male totally from the female while an oblique pull as in practical operation of the snap dislodges from the top edge of the snap.  So, I changed the testing procedure for comparative evaluation.

(Ratnam Report 3.)  As Bell conceded during his deposition that his computer modeling could not account for an oblique pull, AMC argues that his testing was simply irrelevant to Ratnam's conclusions.

This explanation, however, would have the Court ignore Ratnam's unequivocal statement that "[t]he pictures obtained from the well established FEA analysis <u>do not lie</u> and it appears, the hole has a <u>dramatic effect of increasing</u> the flux in the center rivet."

(Supplemental Expert Report of Dev Ratnam at 8 (emphasis added).) There is no

indication from AMC that Ratnam performed his own FEA analysis or received such

testing from any source other than Bell. Yet, in rendering his opinion on a highly

technical, complicated issue, he relies on unsourced FEA results to substantiate his

conclusion that the hollow rivets in the '126 snap increase magnetic attraction, one of the

central issues in this litigation. There is only one conclusion: the Bell tests were

deliberately concealed because they undermined Ratnam's expert analysis. If, as AMC

argues, Ratnam's opinion was unaffected by the revelation of Bell's tests, there would

have been no reason for AMC's mysterious and sudden withdrawal of Ratnam as an

expert. It is even more telling that Ratnam was withdrawn on the eve of trial, leaving

AMC without a scientific expert in a case demanding scientific explanation. AMC's

reliance on the Ratnam Report, even though it knew or should have known of the

contradictory test results generated by Bell, and its failure to disclose the Bell tests were

motivated by bad faith and constituted impermissible litigation misconduct.

 The Federal Circuit has affirmed an award of fees based in part on substantially

similar misconduct. In <u>Eltch Systems Corp. v. PPG Industries, Inc.</u>, the plaintiff withheld

an expert report over the defendant's objections, from which the district court inferred

that the report was unfavorable to the plaintiff's case. 903 F.2d 805, 810 (Fed. Cir. 1990).

The circuit court determined that the inference, along with the district court's underlying

factual findings, were "more than sufficient to establish [the plaintiff's] bad faith and

thereby to render this an exceptional case." <u>Id.</u> Here, rather than an inference that Bell's

<u>tests</u> contradict AMC's assertion of infringement, we have Bell's <u>sworn</u> <u>testimony</u> that

contradicts AMC's assertion of infringement, as well as AMC's eve-of-trial withdrawal

of its expert with the false explanation of "irreconcilable differences." These actions were taken in bad faith and support the conclusion that this case is exceptional.

### 2. Pursuing the Infringement Claim to Trial

Romag also contends that AMC pursued this case to trial without the basic evidence necessary to support its patent infringement claim. AMC failed to present any testimony that compared the claims of the '773 Patent to the allegedly infringing '126 magnetic snap product. It is a fundamental tenet of patent law that infringement is not proven by comparing patent claim to patent claim; rather, the fact-finder must conclude that the <u>actual</u> <u>accused</u> <u>product</u> more likely than not practices the claim of the patent. <u>See Amstar Corp. v. Envirotech Corp.</u>, 239 F.3d 1305, 1313 (Fed. Cir. 2001) (holding that patentee must "present adequate evidence with respect to the accused product, not the content of a patent application that may or may not describe the product"); <u>Decade Indus. v. Wood Tech., Inc.</u>, 100 F. Supp. 2d 979, 982 (D. Minn. 2000) (citing <u>Chem. Eng'g Corp. v. Essef Indus., Inc.</u>, 795 F.2d 1565, 1571 (Fed. Cir. 1986)). AMC offered no expert testimony that the Romag product infringed the '773 Patent; rather, AMC relied on patent attorney, Samson Helgfott, Esq. ("Helfgott"), who testified exclusively that the claims of the Romag patent had already been embodied by the claims of the '773 Patent. But he also acknowledged the insufficiency of this evidence:

> Q. Patents don't infringe, products infringe?
> A. Correct.

(Trial Tr. 90:17-18.)

After Romag moved for Rule 50 relief, the Court gave AMC an opportunity to summarize its evidence of infringement. (<u>Id.</u> 363:1-366:14.) AMC put forth as its "best" evidence a single internet advertisement issued by Romag that stated, "The Patented

ROMAG Magnetic Clasp Has The Difference You Can See.  The Patented Through Hole Feature Gives More Fastening Security, And A Visual Clue To All Others That You Are Using The Original Patented <u>Romag</u> Fastener And Does Not Infringe Any Other Patented Magnetic Clasps In The World." (PX-132.)  AMC argued that the phrase "Gives More Fastening Security" could be interpreted as an admission that Romag's rivet hole provides additional magnetic attraction. (Trial Tr. 363:11-364:13.)  According to AMC, the jury could compare the picture of the snap in that advertisement to an actual sample of the Romag snap and decide for itself whether the hole increased magnetic attraction and thereby practiced Claim 1 of the '773 Patent. (<u>Id.</u> 364:10-13.)  This, it argued, was sufficient circumstantial evidence to get to the jury. (<u>Id.</u> 364:23-24.)  Without evidence of magnetic attraction by the actual snap itself, however, it was impossible for the jury to draw that conclusion. <u>See</u> <u>Franklin Elec. Co. v. Dover Corp.</u>, 84 U.S.P.Q. 2d 1401, 1408 (W.D. Wisc. 2006), <u>rev'd on other grounds</u>, 2007 WL 634430 (Fed. Cir. 2007) ("Whether a defendant 'makes, uses, offers to sell, or sells,' 35 U.S.C. § 271(a), infringement is judged by whether the product itself infringes, not by whether it would infringe if it conformed to some representation made in attempting to sell it."); <u>see</u> <u>also</u> <u>View Eng'g, Inc. v. Robotic Vision Sys., Inc.</u>, 208 F.3d 981, 984-85 (Fed. Cir. 2000) (awarding Rule 11 sanctions against patent owner's counsel for failing to conduct adequate prefiling investigation and alleging infringement based on an advertisement).

Moreover, AMC's reliance on tenuous circumstantial evidence was plainly insufficient when its case called for the measurement of a scientifically verifiable property, namely, the increased magnetic attraction provided by a hole in one or both rivets.  Its only comparative evaluation in this regard was made by its patent expert, an

attorney, who relied on representations made in the '126 application and the '126 claim language itself.  Crucially, AMC offered <u>no</u> evidence of professional testing on the Romag <u>snap</u>.[19]  As discussed above in greater detail, AMC withdrew its technical expert on the eve of trial, ostensibly because when it did test the '126 snap, the FEA test results revealed that the hollow rivet did not increase magnetic attraction.  It did not replace Ratnam with a new expert.

In sum, AMC did not simply fail to adduce sufficient evidence of infringement to survive Romag's Rule 50 motion; it came to trial knowing that it could not possibly meet the well-articulated standards for an infringement claim.[20]

### D.  An Award of Fees Is Warranted

In light of the foregoing analysis, Romag has demonstrated by clear and convincing evidence that this case is exceptional within the meaning of 35 U.S.C. § 285.

---

[19] Bauer, clearly not an expert, testified that the hollow rivet increased magnetic attraction.  However, as noted above, his testimony in this regard lacked any precision.  For instance, he could not articulate the dimensions of the hole in the rivet:

> Q.  Mr. Bauer, is it important what the size of the hole is in the fastener of your '773 patent?
> A.  Oh, yes.
> Q.  It is important.  What size does the hole have to be?
> . . .
> A.  Large enough that it increases magnetic attraction.
> Q.  And what is that size?  Can you tell us in millimeters, inches, or any other dimension?
> A.  No.
> Q.  How does one know what size it should be?
> A.  Common sense.  If there's no steel left in the center, it doesn't work.
> Q.  So if there is no rivet at all because all the steel has been taken away then it doesn't work?
> A.  If the hole is large, more than 50 percent of the rivet, it doesn't work.
> . . .
> Q.  Does your patent say anything about what size the hole has to be other than small?
> A.  No, it's common knowledge.  Anybody skilled in the art would understand that it doesn't work without having enough steel inside.  And for four cents he can try it.  It only costs four cents to buy without a plating on it, so he can really check it.

(Trial Tr. 342:25-344:10.)

[20] The Court rejects Romag's additional argument that AMC pursued its additional claims of false patent marking and unfair competition without hope of success.  While the Court determined that AMC failed to provide sufficient evidence to support these claims (Trial Tr. 370:25-371:15), this failure was not so egregious so as to require a finding of bad faith.

In light of this finding, the Court must now determine whether an award of fees to the prevailing party is warranted.

The primary thrust of this litigation was AMC's claim that Romag had infringed Bauer's '773 Patent—a patent that issued upon inequitable conduct. Thus, every aspect of this litigation that was connected in some way to the validity of the '773 Patent—from the fraudulent inventorship claim in the initial application to the use of a knowingly inaccurate expert report—was nothing more than a tissue of lies. Bauer made a strategic business decision to preserve his economic investment in the magnetic snap industry, concealed the true identity of the '773 snap inventor, and used AMC to bully the handbag industry with a sham patent. When one of AMC's targets finally stood up and challenged the bona fides of the '773 Patent, AMC stubbornly persisted in litigation for almost ten years, burdening three separate district court judges with complex scientific arguments and concepts. Once engaged, AMC routinely obscured the origins of key documentary evidence and concealed that its expert's analysis was without foundation. On the eve of trial, AMC was forced to withdraw the expert on whom it unjustifiably and exclusively relied for more than six years, after it became obvious that his opinion controverted both scientific evidence and its key argument at trial. In a brazen demonstration of willfulness, AMC proceeded to trial without an expert, empanelling a jury for three days without even the remotest possibility of success on its infringement claim. In short, AMC's infringement claim was a colossal waste of time for everyone involved and it would be unfair to burden Romag with the costs of litigating this claim.

Unfortunately, these findings do not result in a complete recovery for Romag. The sole AMC claims with any arguable merit whatsoever were those for patent

mismarking and unfair competition, which focused only on Romag's compliance with its own '126 Patent and were not tied to the '773 Patent. Although the Court held that AMC failed to substantiate these claims at trial, it cannot conclude that the claims were undertaken in bad faith. See Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323, 337 (2d Cir. 1999) ("[J]udgment as a matter of law against a claim is a necessary, but not a sufficient, condition for a finding of a total lack of a colorable basis."). Accordingly, based on the requested supplemental briefing, Romag's overall recovery will be reduced for fees and costs incurred in the defense of these claims.

## II. Claim under 28 U.S.C. § 1927

Section 1927 provides that any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Under Second Circuit precedent, the imposition of sanctions under Section 1927 is appropriate only "when there is a finding of conduct constituting or akin to bad faith." Sakon v. Andreo, 119 F.3d 109, 114 (2d Cir. 1997).[21] Bad faith can be inferred only upon clear evidence that "the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." In re 60 East 80th St. Equities, 218 F.3d 109, 115 (2d Cir. 2000) (citations and internal quotation marks omitted).

---

[21] The present request for sanctions pursuant to 28 U.S.C. § 1927 is governed by the law of the Second Circuit. See Baldwin Hardware Corp. v. Franksu Enter. Corp., 78 F.3d 550, 556 (Fed. Cir. 1996) (holding that substantive and procedural issues not within the exclusive jurisdiction of the Federal Circuit are guided by the law of the regional circuit).

## A. Abelman Frayne & Schwab

Romag contends that counsel for AMC should be held jointly and severally liable for all fees in this matter. This is an oversimplification. The bulk of the litigation—from the drafting of the complaint through trial to the present—has been handled by counsel from the New York-based law firm Abelman Frayne & Schwab ("Abelman"). One member of that firm, Jeffrey A. Schwab, Esq., originally represented Mitchell Medina and his concern, RRC. (Schwab Decl. in Opp'n to Defs.' Mot. for Att'y Fees ¶¶ 7, 12.) In that capacity, Schwab assisted in the negotiation and drafting of Robert Riceman's 1994 employment contract at RRNY. (Id. ¶¶ 24-28.) While Romag strongly suggests that Schwab played a critical role in the misattribution of inventorship in the '773 Patent application, this assertion is not borne out by the evidence; Schwab's name cannot be found in the patent file and there is no suggestion that he helped ready the invention for patent prosecution. Accordingly, Abelman Frayne & Schwab cannot be held responsible for fees arising from inequitable conduct before the PTO.

Nevertheless, counsel from Abelman Frayne & Schwab played an indisputable role in the nondisclosure of the Bell testing and the withdrawal of AMC's expert, Dev Ratnam: it was an Abelman attorney, Anthony J. DiFilippi who received the multiple requests for funding from Ratnam that belie AMC's claim that it was unaware of Bell's testing. But for Romag's persistence, Bell's tests may never have come to light, and the Court believes that counsel from Abelman, Frayne & Schwab would have gone forward with Ratnam, notwithstanding their knowledge of the inaccuracy of his expert report. When additional discovery led to the unraveling of AMC's infringement claim, counsel had to withdraw Ratnam as an expert. At this point (if not sooner), AMC's Abelman

attorneys should have known that, lacking expert testimony comparing Romag's '126 snap to the claims of the '773 Patent—specifically, whether the hole in the Romag snap increased magnetic attraction—the evidence it would present at trial was plainly insufficient to sustain a patent infringement claim. By persisting with this claim to trial, Abelman counsel played a central role in so unreasonably and unnecessarily multiplying the proceedings so as to give rise to bad faith litigation.

As the record demonstrates that counsel from Abelman Frayne & Schwab are culpable only for litigation misconduct, the Court cannot sanction the firm for the earlier inequitable conduct or for initiating the infringement action. See Roadway Express, Inc. v. Piper, 447 U.S. 752, 756 n.3 (1980) (noting that § 1927 authorizes reimbursement only for the excess costs caused, not the wholesale reimbursement of a party for all of its attorney fees). However, counsel's discovery abuses created excess costs for Romag after February 11, 2006, when Ratnam first alerted DiFillipi to the existence of outside testing. At that point, Abelman was put on inquiry notice as to the substance of those tests and their impact on the conclusions drawn by Ratnam. Based, in part, on representations by Ratnam, Romag did not challenge AMC's evidence of infringement at the summary judgment stage. As subsequent events would demonstrate, without Ratnam's technical analysis, AMC's infringement claim was based on blatantly insufficient conjecture and circumstantial evidence. It would never have survived summary judgment and gone to trial. Therefore, the law firm of Abelman Frayne & Schwab is held jointly and severally liable for all fees and expenses generated by Romag

in defense of AMC's patent infringement claim from February 11, 2006 to the conclusion of the case.[22]

**B. Jaroslawicz & Jaros**

When AMC's anticipated trial counsel, Schwab, recognized that he might have to testify as a witness and withdrew as counsel two months prior to trial, AMC hired David Jaroslawicz, Esq., of New York-based Jaroslawicz & Jaros to serve as trial counsel.[23] Jaroslawicz argues in a separate opposing memorandum, and Romag concedes, that he should not be liable, if at all, for fees and expenses incurred before he made an appearance in this case on August 23, 2007. (See Mem. on Behalf of David Jaroslawicz in Opp'n to Defs.' Mot. for Sanctions 9; Defs.' Reply Mem. in Response to the Opp'n of Att'y David Jaroslawicz to Defs.' Application for Att'y Fees & Expenses 3.) There remains a dispute, however, whether Jaroslawicz is responsible for excess fees and costs incurred after that date. The Court finds that he is. Jaroslawicz had been hired for several weeks by the time AMC withdrew Ratnam as its expert for unexplained "irreconcilable differences." (Miller Decl. Ex. 10 at 4:7-23.) Yet, although he lacked any other evidence that the Romag snap infringed the claims of the '773 Patent, Jaroslawicz continued to press AMC's patent infringement claim at trial. The Court disagrees with Jaroslawicz's contention that his late assumption of the role of trial counsel somehow absolves his sanctionable conduct. A letter dated October 5, 2007 from AMC counsel Michael Aschen to Romag counsel Wendy E. Miller establishes that AMC had decided

---

[22] This amount is subject to reduction to allow for expenses generated in defense of AMC's patent mismarking and unfair competition claims. See supra Discussion Part I.D.

[23] AMC intended to call Mr. Schwab to rebut the deposition testimony of Robert Riceman. In an order dated September 5, 2007, the Court granted Schwab's withdrawal as trial counsel but allowed Schwab to assist his successor counsel in matters of trial preparation outside the courtroom.

not to call Ratnam as a trial witness by that date. (Miller Decl. Ex. 9.)[24] On that date, if not sooner, Jaroslawicz should have been aware of the deficiency of AMC's patent infringement claim and is responsible for any excess costs and expenses incurred in preparation for the defense of that claim at trial. Accordingly, Jaroslawicz & Jaros is jointly and severally liable for excess fees generated in defending the infringement claim from October 5, 2007 to the close of the case.

## III. Alter Ego Liability

Arguing that AMC is nonoperational and without assets (other than the now-invalid '773 Patent), Romag requests that Irving Bauer, AMC's owner, president, and sole employee, and G. Bauer, Inc., the New York corporation by which he both funded the development of the '773 Patent and selectively finances AMC, (collectively, the "Bauer Entities") be held jointly and severally liable for any fees awarded.[25] Romag does not expressly state a legal theory by which the Bauer Entities could be held liable; however, its assertion that AMC is a "shell" corporation with a sole owner and employee suggests that it seeks to circumvent the limited liability of corporate ownership on a veil-piercing theory.[26] On the basis of the procedural and evidentiary shortcomings discussed below, Romag's request is denied.

The Bauer Entities are not and never have been parties to this action, and Romag apparently seeks to extend its fee award against them based solely on its contention that there is sufficient identity between Bauer and AMC to bind Bauer individually. This is

---

[24] The letter was mistakenly dated February 23, 2007 and hand-corrected to reflect the actual date of October 5, 2007. (Miller Decl. Ex. 9.)

[25] The Court notes at the outset that Romag devotes less than one page to its argument regarding the Bauer Entities.

[26] In its reply memoranda, Romag concedes that it seeks to pierce AMC's corporate veil. (See Defs.' Reply Mem. to Pl.'s Opp'n to Defs.' App. for Att'y Fees & Expenses ("Defs.' Reply") 9; Defs.' Reply Mem. to Opp'n of Irving Bauer & G. Bauer, Inc. to Defs.' App. for Att'y Fees & Expenses ("Defs.' Bauer Reply") 1-2.)

inappropriate. "One-person corporations are authorized by law and should not lightly be labeled sham." Nelson v. Adams USA, Inc., 529 U.S. 460, 471 (2000) (citing, inter alia, Kirno Hill Corp. v. Holt, 618 F.2d 982, 985 (2d Cir. 1980) (a corporation's veil may not be pierced merely because it has only one owner)).[27]  Accordingly, the Court cannot disregard the corporate form and impose liability on a non-party simply on the cursory contentions of Romag.

Moreover, the Supreme Court has held that due process affords non-parties an opportunity to formally contest personal liability before the imposition of judgment upon them. Nelson, 529 U.S. at 463.  Perhaps recognizing the procedural and constitutional deficiencies of its argument, Romag—in a footnote—belatedly seeks leave to file a motion to amend pursuant to Rule 15, Fed. R. Civ. P., in the hopes of adding the Bauer Entities.[28]  This request is denied.  Although leave to amend a pleading shall be freely given "when justice so requires," Fed. R. Civ. P. 15, the right to amend is not absolute. Amendments may be denied for any number of reasons, including:  "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment." Foman v. Davis,  371 U.S. 178, 182 (1962).  Romag offers no justification for its failure to name the Bauer Entities as individual defendants before this case proceeded to trial.  Romag was certainly aware of Bauer and the instrumental role he played in securing the '773 Patent and in driving the present litigation.  While Bauer was present throughout the trial, his presence was in

---

[27] The Supreme Court went on to note that "where patents are concerned, the one-person corporation may be an altogether appropriate means to permit innovation without exposing inventors to possibly ruinous consequences." Nelson, 529 U.S. at 471.

[28] (See Defs.' Reply 9 n.14; Defs.' Bauer Reply 2 n.1.)

his capacity as the owner of AMC. Whether he might have pursued alternate strategies for defending against the inequitable conduct claim if facing personal liability is a matter of speculation. Such "predictions about the outcome of hypothesized litigation cannot substitute for the actual opportunity to defend that due process affords every party against whom a claim is stated." Nelson, 529 U.S. at 471. Certainty could be assured only if the case were retried, a possibility the Court is unwilling to entertain at this extremely late hour, especially when Romag could have named the Bauer Entities at a much earlier point. Consequently, the Court denies Romag's motion to amend the pleadings to add the Bauer Entities as parties.

## IV. Pre- and Post-Judgment Interest

Pursuant to 28 U.S.C. § 1961, Romag is entitled to recover post-judgment interest "from the date of the entry of the judgment," which in this case is November 7, 2007, the date on which the Court dismissed AMC's meritless patent infringement claim on Romag's Rule 50(a) motion. In addition, as the Federal Circuit clarified in Mathis v. Spears, "a district court . . . [has] authority, in cases of 'bad faith or other exceptional circumstances,' to award prejudgment interest on the unliquidated sum of an award made under Section 285." 857 F.2d 749, 761 (Fed. Cir. 1988). In light of the Court's findings of inequitable conduct and litigation misconduct, Romag is entitled to recover pre-judgment interest in an amount to be determined after supplemental briefing.

## CONCLUSION

For the foregoing reasons, Romag's motion is granted in part and denied in part as follows:

- Consistent with the Court's finding of inequitable conduct, U.S. Patent No. 5,572,773 is invalid;

- Romag's Motion for Attorneys' Fees and Expenses is granted as stated herein to the extent that the case is found to be exceptional pursuant to 35 U.S.C. § 285;

- Pursuant to 28 U.S.C. § 1927, AMC's counsel—Abelman Frayne & Schwab and Jaroslawicz & Jaros—are jointly and severally liable for Romag's reasonable fees and expenses as stated herein;

- Romag's motion is denied with respect to its request to recover fees from non-parties Irving Bauer and G. Bauer, Inc.;

- Romag is entitled to pre- and post-judgment interest.

While Romag has submitted some evidence of attorney fees and costs incurred in this matter, neither party devotes significant discussion to the reasonableness vel non of the requested amount. See Hensley v. Eckerhart, 461 U.S. 424 (1983) (setting forth standard for determining "reasonable" fee awards); Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d 182 (2d Cir. 2008) (same). To that end, Romag shall file with the Court, within thirty (30) days from the date of this order, an itemized accounting of the fees and costs incurred, together with supporting documentation and information regarding the basis for calculating the fees and costs claimed by Romag. Romag is also directed to submit an accountant's declaration calculating pre- and post-judgment interest at the applicable rate. Within thirty (30) days following the filing of that application, AMC shall file with the Court any objections to Romag's fee application. Romag shall file and serve any reply regarding its fee application within fourteen (14) days after the filing of AMC's opposition. The parties

should speak to what portion of Romag's fees and costs were incurred in the defense of the patent infringement claim as opposed to the patent mismarking and unjust enrichment claims.

The Clerk of the Court is directed to terminate this motion.

Dated: New York, New York
July 17, 2008

SO ORDERED

PAUL A. CROTTY
United States District Judge